## Case No. 6,476.

### The HIGHLANDER.

[Spr. 510; 22 Law Rep. 473; 42 Hunt, Mer. Mag. 192.] [1]

District Court, D. Massachusetts. Dec., 1859.

SEAMEN'S WAGES—DIVERS AND WRECKERS.

1. A seaman's lien for wages is not defeated by a previous attachment of the vessel, at common law, in a state court, abandoned before the filing of the libel.

[Cited in Pendergast v. The General Custer, 10 Wall. (77 U. S.) 218; The Home, Case No. 6,657; The Pioneer, 21 Fed. 427; The Sarah E. Kennedy, 29 Fed. 266; The Cerro Gordo, 54 Fed. 392.]

2. The services of divers and wreckers on board of a sea-going vessel, are maritime, and they have a lien upon the vessel therefor.

[Cited in The Murphy Tugs, 28 Fed. 430.]

3. Where the defence against an asserted lien for a seaman's wages, is a renunciation thereof, at the time of shipping, the court will require proof that the agreement was fully understood by the seaman, and that there was an adequate compensation for the waiver.

[Cited in The International, 30 Fed. 377; The L. L. Lamb, 31 Fed. 34.]

Libel by five seamen for wages, claimed to have been earned on a wrecking voyage to the British provinces, in the summer of 1859. The shipping articles showed the wages to have been put down in decimals at twenty-five and eighteen cents per month. It was not denied, however, that the real contract was for eighteen and twenty-five dollars per month; and the libellants insisted that they saw only the figures 18 and 25 in the articles, when they signed, and supposed that they meant dollars and not cents. The defence offered was, that the vessel had been chartered for the voyage, to one Charles Sanborn, under a contract to victual and man her, at his own expense; that the libellants had been distinctly informed, when they shipped, that they were to look to the charterer only, for their pay; that the wages in the articles were nominal, and that this arrangement was assented to by the crew. Before the filing of this libel, the libellants had attached the vessel in an action at common law, which they afterwards abandoned.

H. Pelham Curtis, for libellants.
J. C. Dodge, for claimants.

SPRAGUE, District Judge. The objection of the claimants that an attachment of the vessel at common law, made and abandoned before the filing of a libel in this court, defeats the lien of seamen for wages, cannot be sustained. A common law lien depends on possession, and is lost when the creditor causes the res to be taken possession of by an officer, by writ of attachment. The property, in such case, is in the custody of the law, and out of the possession of the creditor,

1 [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission. 42 Hunt, Mer. Mag. 192, contains only a partial report.]

and a common law lien is therefore lost. But a maritime lien does not depend on possession.

I hold, as I have held before in the case of The Paul Boggs [Case No. 10,846], decided some years since, that the lien is not defeated by a previous attachment in a state court. It has been also objected by the claimants, that the services for which two of these libellants were employed, viz., diving and wrecking, are not of a maritime character. I cannot adopt this view. Though principally hired for their skill as wreckers, they were also required to aid in the general management of the vessel, and I am of opinion that they, like the rest of the crew, are entitled to enforce their claims for wages by a libel against the schooner, in this court.

There is no controversy, that seamen, prima facie, have a right to look to the vessel for their wages. The entries of twenty-five cents and eighteen cents, in these articles, are admitted not to be the wages agreed upon, which were eighteen and twenty-five dollars; and the principal ground of defence is that the libellants, by their original contract, relinquished their lien, and agreed to look to the personal credit of Sanborn alone. [The question here is, whether the libellants are precluded from enforcing their lien on the vessel by a previous binding agreement to give up such lien.][2]

Agreements varying the rights given to seamen by the general maritime law, are always scrutinized with great care, by courts of admiralty. Seamen, as a class, are ignorant and credulous, and rely in great measure, in their contracts with their employers, on the general known rights of sailors, as expressed in the shipping articles, which are a printed document known to contain certain well-understood stipulations, and any variation from them is looked on with jealousy by the courts. New clauses impairing the rights of seamen, are generally held inoperative.

Whenever an unusual clause is introduced into the shipping articles, impairing the rights of seamen, or imposing any additional duties or obligations on them, two conditions are required: 1st. That the seaman had the agreement so explained to him that he fully understood its meaning, and. 2d. That a reasonable compensation was given him for the renunciation of the right, or for the new obligation assumed.

The agreement set up in defence, in this case, was not inserted in the articles, but rests only in parol. Certainly the requirements will be not less rigorous, in the case of a parol agreement, than when a written alteration of the articles is made. Was there, then, a sufficient explanation made to these libellants, of the extent of the waiver which they are alleged to have made? And was there an adequate consideration for this waiver?

[2] [From 22 Law Rep. 473.]

[It is true that the charterer Sanborn is not legally interested in the result of this suit. In law, his interests are equally balanced; but he can scarcely be considered an unbiased witness. Regarding him as such, however, he has not stated that the waiver of their lien was a matter much or at all talked about with the crew before they shipped, or that he took pains to explain to them the extent of their renunciation. He states only in effect that he told each seaman before he shipped that he was to sign for 25 cents "to clear the vessel." Nor does it appear that he offered to pay them an adequate consideration for the waiver. He says only that he gave the crew two dollars more than the ordinary wages of the port at the time, $16 for a foremast hand. I cannot regard this testimony as sufficient in clearness and weight to warrant me in giving validity to an agreement like the present. It does not appear in the testimony for the defence that $18 was more than the ordinary wages of the port at the time. Except Sanborn himself, no witness was produced to testify that these wages were beyond the usual rates for maritime services, such as these libellants performed. Nor is it unreasonable to suppose, I think, even admitting that these wages were two dollars higher than the ordinary wages at the time, that the peculiar character of the voyage, the dangerous nature of the coast near which the vessel was to be employed, and the uncertainty in the duration of the expedition, were ample reasons for a small advance on the rates at which a crew for an ordinary voyage could have been obtained.

[On the question whether the seamen understood the nature of the alleged agreement, the testimony is conflicting. Butters, the shipping-master, a witness produced by the claimants, swears that the libellants were distinctly informed, at the time they shipped, of the nature of the agreement they are alleged to have made, and bases his testimony chiefly on a paper signed by two of them, and which has been produced and read. But this paper proves to be merely an agreement not to hold liable for their wages what might be recovered from the wreck. In it they have waived any lien on the salvage, so called, but not on the vessel; and I think it clear that the witness has confounded in his recollection the one with the other. The written paper to which he refers, and the contents of which he had forgotten, contains no stipulation to renounce any lien on the vessel. Moreover, if, as is insisted, these libellants waived their lien on the vessel, why was there no written agreement to this effect explained to and signed by the crew, when, in the case of two of them at least, their waiver of a lien on the salvage was so carefully reduced to writing?

[It has been testified that the crew were told in the cabin, they were signing "to clear the vessel." What did they understand by

this? As they were aware that they had waived their lien on the salvage, I think it reasonable to infer that they applied the expression of clearing the vessel to this waiver, and that they probably understood nothing more by it than that they signed "to get a clearance for the vessel," with which expression they were no doubt familiar. With regard to the remainder of the evidence, we have Ross, a witness for the libellants, who expressly contradicts Sanborn in his testimony as to a conversation on the subject of the agreement with the crew. Sanborn is also contradicted in several essential points by all the libellants. Thus contradicted, and standing in a situation to be biased, and no evidence being before me that the alleged agreement was sufficiently explained to the crew, I cannot hold that these libellants consented understandingly when they shipped to waive their ordinary lien on the vessel for their wages.][3]

It has not been shown, either that the libellants knowingly agreed to relinquish their lien, or that they received any compensation for the alleged renunciation. Decree for libellants for the full amount of their claims and costs.

See, also, The Gazelle [Case No. 5,289].